**John and Martha Jane MULHOLLAND, Plaintiffs,**

v.

**Christopher KERNS and Kerns and Klimek, P.C., Defendants.**

**No. 92–1230.**

United States District Court, E.D. Pennsylvania.

April 30, 1993.

Memorandum Denying Motion to Alter or Amend Judgment June 11, 1993.

David Kraut, Kraut & Harris, P.C., Laurie G. Ohliger, Cardis, Kraut & Harris, P.C., Plymouth Meeting, PA, for plaintiffs.

Christopher Kerns, pro se.

Robert A. Klimek, Jr., Kerns & Klimek, P.C., Washington, DC, for defendant.

*FINDINGS OF FACT, CONCLUSIONS
OF LAW AND ORDER*

YOHN, District Judge.

Plaintiffs brought this suit, seeking declaratory relief and damages arising from their attorney-client relationship with defendants. Plaintiffs allege that defendants received portions of contingent fees to which they were not entitled, and they seek to have them returned. In addition, plaintiffs contend that defendant Kerns was terminated for good and just cause, and they seek a declaratory judgment that defendants are therefore not entitled to any further attorneys' fees. Alternatively, the plaintiffs ask that, if the court finds that Kerns was not terminated for good and just cause, the court find that defendants have already been adequately compensated for their work and are entitled to no further fees. Defendants, in their counterclaim, contend that they are entitled to recover quantum meruit for the reasonable value of their services until the date of their discharge.

A bench trial was held in this case on April 5, 6, 7 and 14, 1993. In accord with the following findings of fact and conclusions of law, the court finds for the defendants on the plaintiffs' claims and finds for the defendants on their counterclaim in the amount of $30,-000.00.

**I.**

The court makes the following findings of fact:

1. Plaintiffs are and at all relevant times were citizens of Oklahoma.

2. Defendants are and at all relevant times were citizens of Washington, D.C. Defendant Kerns and Klimek, P.C., was a law firm with its principal place of business in Washington, D.C.

3. On or about March 9, 1984, plaintiff John Mulholland, on behalf of himself and his wife, Martha Jane Mulholland, entered into a fee agreement ("original fee agreement") with defendant Kerns, acting for the firm of Kerns and Klimek, P.C., ("the Firm").

4. Under this original fee agreement, the Firm represented the Mulhollands in a lawsuit arising out of an automobile accident on February 1, 1984 in Montgomery County, Pennsylvania, which seriously injured Mr. Mulholland.

5. The original fee agreement provided that the Firm would be paid a contingency fee to be calculated as follows:

25% of the gross recovery if settled prior to trial stage (one month before the scheduled trial is usually defined as the "trial stage") or 30% of the gross recovery if the case must proceed to the trial stage. The reason for the trial stage, being the intense trial preparation which always takes place within the month prior to trial.

6. During the course of his representation of plaintiffs in this suit, defendant Kerns left the Firm and joined two other law firms in succession before assuming his present position, that of Vice-President and General Counsel for Fort Meyer Construction Company.

7. Defendants, initially both Kerns and the Firm, and later, Kerns as a member of other law firms or by himself, represented plaintiffs in a suit captioned *Mulholland, et al. v. Palmen, et al.,* C.A. No. 84–11623, filed in the Montgomery County Court of Common Pleas ("underlying suit"). Until his dismissal by plaintiffs, defendant Kerns continued to represent plaintiffs in the underlying suit.

8. Plaintiff John Mulholland and defendant Kerns, on behalf of the Firm, entered into a second fee agreement on January 11, 1985, during a visit by Kerns to the home of plaintiffs in Oklahoma. This second agreement was handwritten. The contested terms are all in the handwriting of Martha Jane Mulholland. Several remaining terms are in the handwriting of Christopher Kerns.

9. This second fee agreement referred to $15,000.00 to be collected from "Palmen," a defendant in the underlying lawsuit who had previously tendered his $15,000/$30,000 insurance policy limits, and $5,000.00 to be collected from "Western Auto," which was plaintiffs' insurance carrier, Western Casualty and Surety Company. With regard to these amounts, the agreement specified, in Mrs. Mulholland's hand, that the "1st 20,000 John gets without contingency b/c [because] it is automatic and b/c he paid $2,948.00

previously in atty [attorney] fees [to defendants]."

10. Plaintiffs' claims against all of the defendants in the underlying suit and against their own insurer have been settled out of court and without trial.

11. During the time of defendant Kerns' representation, the plaintiffs settled claims relating to the underlying suit yielding a total recovery of $517,500.00, of which defendants received $141,590.00 in fees. In addition, by agreement, defendants received some $2900.00 in fees for the initial investigation before the contingent fee contract was signed.

12. In the spring of 1990, after a period of dissatisfaction with Kerns because of his inability to move the case forward, plaintiffs terminated their attorney-client relationship with defendants.

13. After Kerns' representation was terminated, plaintiffs settled claims relating to the underlying suit yielding a total recovery of $269,870.00, of which Kerns' successor received $80,961.00 in fees under an agreement which gave the attorney a 30% contingency fee.

14. No agreement was reached at the time of defendants' termination or subsequently as to any additional compensation for defendants' services, although the matter was discussed.

### Plaintiffs' Claim of $26,500 from Western Auto Payment

15. The policy with Western Casualty and Surety Company ("Western Auto") provided $5,000.00 in medical payments if the insured were injured. In the second fee agreement, it was understood by plaintiffs and defendant Kerns that the $5,000.00 to be collected from Western Auto on which there would be no contingency fee was this medical payments benefit, which was described in the agreement as "automatic."

16. On its face, the policy with Western provided, in addition to medical payments, uninsured coverage to plaintiffs. None of the defendants in the underlying suit was uninsured. The policy said nothing about underinsured motorists. In Oklahoma, however, uninsured motorists' coverage is interpreted to provide coverage for underinsured claims as well. In addition, under Oklahoma law, coverages may be stacked. Plaintiffs had $35,000.00 of coverage on each of their three motor vehicles, for a total of $105,000.00 in uninsured or underinsured coverage or both.

17. Neither plaintiffs nor defendants knew with any specificity at the time the second fee agreement was signed that an additional $105,000.00 claim could be made against "Western Auto" for underinsured motorists' benefits.

18. At the time the second fee agreement was signed, defendants cannot reasonably be expected to have been sufficiently familiar with Oklahoma law to know that the Western Auto policy included underinsured motorists' benefits.

19. Plaintiffs argued fraud at trial with regard to defendants' not having informed them of the possibility of the underinsured motorists' recovery; however, fraud was not pleaded in the complaint and no evidence of fraud was introduced at trial. Furthermore, even if such a charge had been made and supported, it would have been subject to a statute of limitations defense.

20. The underinsured motorists' coverage was in no sense "automatic." It was excess coverage. In order to collect it, plaintiffs had to demonstrate that the amounts that they had collected or would be able to collect from the defendants in the underlying suit would not be enough to cover their damages. This demonstration took a substantial amount of work in the form of preparation of the rest of plaintiffs' case in terms of liability and damages.

21. If plaintiffs had meant for any payments from Western Auto that were not "automatic" to be excluded by the second fee agreement, Mrs. Mulholland, an attorney herself, who was writing that part of the agreement, would have written it that way. The plaintiffs' oral testimony to the contrary at trial was not credible.

22. The claim against Western Auto for underinsured motorists' coverage was settled for $105,000.00 in September of 1986. Following the settlement, defendant Kerns claimed a fee of 25% for the defendants.

23. Plaintiffs initially disputed this claim of a fee, saying that everything collected from Western Auto should be exempted from a contingency fee.

24. At the time the settlement with Western Auto was achieved, John Mulholland and Christopher Kerns had a telephone conversation concerning the payment of counsel fees. At this point all parties were aware of the exact nature of the underinsured motorists' coverage. During the discussion, Mulholland agreed that a 25% contingency fee would be paid on the settlement for underinsured motorists' benefits.

25. Defendant Kerns sent the check from Western Auto for the entire $105,000.00 to the plaintiffs and authorized them to sign his name to the check so that they could deposit the check in their account and forward the defendants' fee of 25% to him.

26. The plaintiffs deposited the check and paid the 25% fee as Kerns asked. Plaintiffs did not attempt to withhold the fee in accord with their claim for all of the recovery from Western Auto.

27. There was no duress by defendants with respect to plaintiffs' payment of this claim. The fact that plaintiffs had in their possession the entire recovery and sent defendants their fee serves as evidence that they agreed to pay the contingency fee on the underinsured motorists' benefit voluntarily and without duress. Nor is there any evidence that as a result of defendants' claim for a fee, plaintiffs considered firing defendants at that time or seeking the advice of other counsel.

28. The collection of the underinsured motorists' benefit had an effect on the settlement of claims against the defendants in the underlying suit. If it had not been recovered, the claims against those defendants would have had to be increased to achieve the same total recovery, so that the same underlying work by Kerns was required for the underinsured claim as for the other liability claims.

### Plaintiffs' Claim of $7500 from LCB Settlement

29. The second fee agreement also specified as follows, in Mrs. Mulholland's handwriting:

after 1st 20,000
  25% to Kerns before trial
  30% to Kerns if go to trial[.]

30. Settlement with the Liquor Control Board ("LCB") for $300,000.00 was achieved 19 days before a previously scheduled trial date.

31. At the time of settlement, plaintiffs and defendants disagreed as to whether defendants should receive a fee of 25% or 30%.

32. The fee disagreement was due in part to a difference in the language of the two fee agreements. The first agreement and all other drafts submitted by Kerns used and defined the term "trial stage;" the second fee agreement, in a section written by Mrs. Mulholland, contained the "go to trial" language.

33. This difference in language was not discussed at the meeting of the parties in January, 1985, when the second fee agreement was signed, and it was not made clear whether the 30% fee would be recovered in the event the case reached the trial stage or only if it actually went to trial.

34. The fee disagreement was also due in part to the continuance of the trial approximately three weeks before its scheduled date and Kerns' partial preparation for trial.

35. At the time of settlement, the dispute over the percentage of the contingency fee was discussed by John Mulholland and Kerns. They resolved the dispute by settling on a 27.5% fee which was paid.

### Plaintiffs' Claim that Kerns was Fired for Cause

36. Kerns antagonized the trial judge and the counsel for Upper Gwynedd Township, the defendant in the underlying suit which potentially offered the largest recovery. The antagonism was a result of their generally losing faith in his credibility and personality conflicts.

37. The trial judge, in trying to encourage a settlement pending an interlocutory appeal by Upper Gwynedd Township, warned the Township that plaintiffs might increase their settlement demand if the appeal were denied. This bargaining strategy was misun-

derstood by Kerns to be an open invitation to increase plaintiffs' settlement demand if Upper Gwynedd lost its appeal.

38. While the appeal was pending, the trial judge worked out a tentative settlement with all the attorneys, pending approval by the parties. After Upper Gwynedd lost its appeal, the plaintiffs raised their settlement demand substantially in the June, 1989 settlement conference, thereby antagonizing the judge.

39. Kerns, as the plaintiffs' attorney, bears the major responsibility for making the judgment to increase the demand; however, plaintiffs share the responsibility for antagonizing the judge because they agreed to the increased settlement demand. In addition, after firing Kerns, the plaintiffs again made a demand which was substantially in excess of the tentative settlement to Upper Gwynedd Township. Plaintiff's Exhibit P–22.

40. After the disagreement with the trial judge in the June 1989 settlement conference, the plaintiffs' case did not move forward. Kerns could have taken a number to steps to resolve the impasse. Among other things:

(a) He could have circulated among all counsel a certificate of readiness to place the matter on the trial list. Since he testified that all counsel were ready to go to trial, the filing of the praecipe would have caused the court administrator to schedule the matter for trial.

(b) He could have withdrawn the pending motions which he had previously filed if that was necessary in order to have the certificate of readiness for trial filed.

(c) He could have requested a Rule 212K conference under Montgomery County local rules with the trial judge wherein the judge would have heard the contentions concerning the scheduling of trial and made a decision as to whether or not to list the case for trial.

(d) If the trial judge did not act on this request, he could have requested a conference with the President Judge to review the situation and seek a remedy.

(e) He could have brought in another attorney to get the case listed for trial, since that attorney would not have had the same credibility problems that he had at that time. He was still a member of a firm in Washington and could have used another lawyer with that firm. He had local counsel associated with him (although that counsel was from Chester County) and could have used him or a member of his firm. Kerns also testified that plaintiffs' present attorney, who practices in Montgomery County, had already entered an appearance in the case and Kerns could have contacted him for assistance in this regard.

41. Kerns was unfamiliar with local practices in Montgomery County and he did not take advantage of his local contacts in order to resolve the dispute. His case was, at this point, floundering, and plaintiffs had lost confidence in him.

42. Kerns' conduct in the case was not wrongful, in the sense that he had not committed any illegal or immoral acts.

### The Amount of Defendants' Fee

43. Kerns estimates that the case was 85% prepared when he was terminated. He therefore seeks 85% of 27.5% of the amount recovered after he was fired. That amount was $269,870.00 of which he claims $63,082.00.

44. Kerns testified that he spent approximately 2,000 hours on the case, 1,400 while with the Firm and 600 after he left it. Of this total, he allocated 1,000–1,200 hours to the suit against Upper Gwynedd Township.

45. Kerns' estimate of the total time allocated to the case while he was at the Firm was based on a summary of hours made when he left the Firm, which the court finds was accurate. The original records on which the summary was based are unavailable for all practical purposes. Because the hourly computation was irrelevant to his contingent fee, there was no motive connected with this case for Kerns to inflate the contemporaneous summary of hours. He was doing the work at that time without any anticipation that the hours devoted to the task might be relevant to the fee to be charged his client.

46. While it is clear that Kerns devoted unnecessary hours to the case, no evidence was submitted by anyone that would allow

this court to quantify the number of such hours. Plaintiff's expert witness did not quantify his opinion as to the total unnecessary time expended by Kerns. Cross-examination of Kerns did not result in any evidence from which the court could make a reasoned decision as to the number of unnecessary hours. Nor were hourly records submitted that the court might review in order to make its own determination. Therefore, the court cannot make a judgment as to the number of unnecessary hours and the number of allocated hours is of minimal use to the court.

47. Because Kerns did not achieve settlement of all of the claims in the underlying suit or resolve the problems stated above which prevented the case from being listed for trial, plaintiffs hired a new attorney to complete the work after they fired Kerns for failing to move the case forward.

48. The new attorney had to duplicate some of Kerns' work in order to get the case ready for trial.

49. Plaintiffs' expert testified and the court finds that the damages aspect of the case was not nearly ready for trial at the time of Kerns' termination and that, in addition to preparing for the trial itself, there was substantial work that needed to be done in order to bring the case up to date.

50. The case was substantially less than 85% ready for trial when Kerns was dismissed.

51. In view of the conflicts that Kerns had with counsel for Upper Gwynedd Township, the trial judge, and plaintiffs' transition attorney in Oklahoma, it is clear that he must bear a substantial portion of the responsibility for the personality conflicts and credibility problems which resulted in his inability to get the case settled.

52. Kerns was overly concerned with protecting his fee, rather than the best interests of his clients, during the problem time from June 1989 until his termination in March of 1990. In addition, he did not withdraw his appearance even after he was terminated in March of 1990 and continued to hold the files in his possession for a long time thereafter.

53. However, Kerns did a substantial amount of work in the underlying case that was important to the settlements achieved after his dismissal. He drafted the pleadings and filed the case, took depositions, investigated and prepared the case as to liability, partially prepared the case as to damages, and successfully argued appeals.

54. Considering the work Kerns did in the underlying case, the difficulty of the liability issues in the case, the results that he partially achieved, and the responsibility that he bore for delays and additional expenses, the court finds that the quantum meruit value of defendants' services for which they were not compensated is $30,000.00.

## II.

Plaintiffs assert and the defendants assume that the law of Pennsylvania applies to this diversity case. The court will therefore apply Pennsylvania law. The parties do not disagree as to the Pennsylvania law of contracts, which affects plaintiffs' first claim regarding the recovery from Western Auto under the second fee agreement and their second claim with regard to the fee collected on the LCB settlement. Nor do they dispute the interpretation of the law of compromise and of accord and satisfaction, which affects plaintiffs' second claim. With respect to these issues, it is primarily the facts on which they disagree. Therefore, no discussion of the applicable law is necessary.

Plaintiffs and defendants do disagree with regard to the interpretation of Pennsylvania law of recovery of fees after dismissal of an attorney who had a contingent fee agreement with his client. Plaintiffs argue that when such an attorney is dismissed for "good and just cause," he is entitled to no recovery. Defendants contend that when such an attorney is dismissed with or without cause, he is entitled to recovery quantum meruit.

Plaintiffs rely on two cases from the Pennsylvania Superior Court in support of their claim that if the attorney is discharged for just cause, he is entitled to no compensation, *Lampl v. Latkanich,* 210 Pa.Super. 83, 231 A.2d 890 (1967), and *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot,* 312 Pa.Super. 125, 458 A.2d 545 (1983).

In *Lampl*, the plaintiff was an attorney who had signed a contingent fee agreement entitling him to ten percent of " 'anything of value' recovered or realized" from the corporation in which Mr. Latkanich was a major investor. 210 Pa.Super. at 86, 231 A.2d at 891. Plaintiff was summarily discharged before anything had been recovered or realized from the corporation but after he had done a substantial amount of work. He sued for recovery quantum meruit, and a jury awarded him $5,580.00, only $210.00 less than the amount of his claim. 210 Pa.Super. at 88–89, 231 A.2d at 893. The court had instructed the jury that a verdict for Lampl would require a finding that he had been dismissed "through no fault on his part." 210 Pa.Super. at 91, 231 A.2d at 894. The jury found for the plaintiff and on appeal the Superior Court carefully reviewed the record and noted, "[W]e have not found sufficient credible testimony to substantiate defendants' allegations regarding plaintiff's misconduct." *Id.*

The authority on which the Superior Court relied for the dictum that an attorney is entitled to no compensation if he is discharged for his own wrongful acts was a case from the Southern District of New York in which an attorney had to withdraw his representation because he was disbarred for committing a felony unconnected with his representation in the case. *In re Woodworth*, 15 F.Supp. 291 (S.D.N.Y.1936), *aff'd*, 85 F.2d 50 (2d Cir.1936). The Court of Appeals in that case found that the attorney's termination for his own wrongful conduct amounted to willful abandonment of the case and entitled him to no recovery in quantum meruit. The *Woodworth* case, in which the wrongful act was a felony, provides little guidance in the present case.[1]

In the second case that the plaintiffs cite, *Feld*, clients who had committed perjury, falsified exhibits, and offered a potential witness a bribe, allegedly on the advice of their attorneys, sought compensatory and punitive damages from their attorneys for malprac-

tice. The Superior Court agreed with the trial court that the plaintiffs could not recover damages because they and their attorneys were in pari delicto, but it held that they were entitled to recover the legal fees they had paid their attorneys if they could prove their allegations.

In both cases on which plaintiffs rely to show that wrongful conduct by their attorneys allows clients to recover, or not to pay, attorneys' fees, the wrongful acts by the attorneys were criminal acts. Plaintiffs have cited no authority suggesting that anything less than criminal wrongs would result in a complete denial of compensation. The court has found no authority suggesting that anything less than illegal or immoral conduct would result in a complete denial of compensation. *Woodbury v. Andrew Jergens Co.*

In cases from other jurisdictions in which dismissed attorneys had committed lesser wrongs, such as lack of skill or inadequacy of representation, that conduct was considered in calculating the amount of the award and did not bar recovery altogether. *See e.g. Susan E. Loggans & Assoc. v. Estate of Magid*, 226 Ill.App.3d 147, 168 Ill.Dec. 203, 589 N.E.2d 603 (1992).

Defendants rely on the California courts, which allow compensation quantum meruit when an attorney is dismissed with or without cause. They allow almost anything to count as "cause." *See Fracasse v. Brent*, 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9 (1972). Whenever a client loses faith in his attorney, that is cause for dismissal. *Id.* California takes this position in order to allow a client the greatest scope in choosing his attorney without penalizing the attorney in whom the client loses confidence. This approach is not inconsistent with those cited above when dismissal for "cause" in this sense is distinguished from dismissal for "wrongful acts," which entitles an attorney to no compensation at all. Defendants in the present case may have been dismissed for

1. Another New York case denied recovery to attorneys who had worked under a contingent fee agreement after they refused to complete work on the case or to attend scheduled depositions unless the clients signed a new contract giving them a higher fee. *Woodbury v. Andrew Jergens Co.*, 61 F.2d 736 (2d Cir.1932). The

court found that their actions comprised willful abandonment and that they could not collect either on the contract or quantum meruit. The wrongful acts in *Woodbury* were not criminal, but they were well beyond anything that occurred in the present case.

"cause" without the cause rising to the level of wrongful acts that would cause them to forego compensation altogether.

Defendants seek recovery of fees quantum meruit for work done on the case after the LCB settlement. Black's Law Dictionary defines "quantum meruit" as "as much as deserved." It goes on to say that quantum meruit "measures recovery under implied contract to pay compensation as reasonable value of services rendered."

■ Pennsylvania does not have a specific method for determining attorneys' fees quantum meruit, per se, but it does have a standard for determining reasonable attorneys' fees. *In re Trust Estate of La Rocca*, 431 Pa. 542, 246 A.2d 337 (1968). That standard was set in an estates case, but it has been cited in other contexts as well. *See, e.g., Gilmore v. Dondero*, 399 Pa.Super. 599, 582 A.2d 1106 (1990) (reducing attorney's contingency fee in minor's personal injury case from one-third to one-quarter); *Holland v. Workmen's Compensation Appeal Bd. (PEP BOYS)*, 137 Pa.Commw. 22, 586 A.2d 988 (1990) (reasonable attorney's fee for preparing affidavit). The court has found no Pennsylvania case which says that a common law quantum meruit recovery of attorneys' fees must be based on hourly records, and it stands to reason that the court should not be so limited in a case in which detailed hourly records are not available. In contingency fee cases, attorneys often fail to keep the sort of detailed time records that they do when billing on an hourly basis.

The *La Rocca* court had the following to say about reasonable attorneys' fees:

> The facts and factors to be taken into consideration in determining the fee or compensation payable to an attorney include: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; ... the degree of responsibility incurred; ... the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money ... in question.

431 Pa. at 546, 246 A.2d 337 (footnote omitted, citations omitted).

The reasonable value of attorneys' fees has been calculated by a variety of methods in other jurisdictions. The New Jersey Superior Court has granted quantum meruit awards of attorneys' fees on an hourly basis and on a percentage basis, depending on which method of calculation seemed the more reasonable in the particular case. *See, e.g., Anderson v. Conley*, 206 N.J.Super. 132, 501 A.2d 1057 (1985); *Buckelew v. Grossbard*, 189 N.J.Super. 584, 461 A.2d 590 (1983); *La Mantia v. Durst*, 234 N.J.Super. 534, 561 A.2d 275, *certif. den.*, 118 N.J. 181, 570 A.2d 950 (1989). In New York, in a fee dispute between a dismissed attorney and a client, the outgoing attorney was allow to chose to take his quantum meruit award on an hourly basis before final resolution of the case or as a percentage of the final recovery, when it was available. *Cordes v. Purcell, Fritz & Ingrao*, 89 A.D.2d 870, 453 N.Y.S.2d 237 (1982).

■ This court concludes that, as long as it adheres to the standards set out in *La Rocca*, it may calculate attorneys' fees quantum meruit in whatever way seems most reasonable, given all the circumstances of the case before it.

### III.

The court reaches the following conclusions of law:

1. This court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1).

2. The second fee agreement exempted from attorneys' fees on the Western Auto recovery only $5,000.00 "automatic" medical payments.

3. Defendants appropriately expected a fee on the underinsured motorists' benefits recovery from Western Auto and John Mulholland agreed to pay the fee when defendant Kerns demanded it.

4. John Mulholland was not subject to fraud or duress when he agreed to pay the 25% contingent fee on the Western Auto underinsured motorists' recovery, nor were plaintiffs subject to fraud or duress when

they paid the fee after having had the entire settlement proceeds in their possession. The court will therefore not disturb defendants' recovery of this fee.

5. John Mulholland and Christopher Kerns had a legitimate dispute as to whether the contingency fee on the LCB recovery should be 25% or 30%. They reached a genuine compromise of 27.5%, and the court will not disturb that compromise.

■ 6. John Mulholland had a right to terminate his attorney-client relationship with the defendants at will, subject to certain responsibilities discussed below. *Dorsett v. Hughes*, 353 Pa.Super. 129, 509 A.2d 369 (1986); *Sundheim v. Beaver County Bldg. & Loan Ass'n*, 140 Pa.Super. 529, 14 A.2d 349 (1940).

7. Kerns was terminated for cause, but not for wrongful acts, that is to say that he was not terminated for illegal or immoral acts. *Lampl v. Latkanich*, 210 Pa.Super. 83, 231 A.2d 890 (1967); *In re Woodworth*, 15 F.Supp. 291 (S.D.N.Y.1936), *aff'd*, 85 F.2d 50 (2d Cir.1936); *Fracasse v. Brent*, 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9 (1972).

8. An attorney who is terminated (for reasons other than wrongful acts), thus making the performance of his contract impossible, is entitled to a quantum meruit recovery for his services. *Sundheim v. Beaver County*.

■ 9. Any inadequacy in Kerns' representation of the plaintiffs goes to the amount of the quantum meruit recovery.

10. Because Kerns was terminated for cause, but not for wrongful acts, defendants are entitled to compensation quantum meruit for the reasonable value of their services before termination.

11. The court has found no Pennsylvania authority that limits common law quantum meruit recovery of attorneys' fees to cases in which detailed time records were kept and are presented. Quantum meruit is a very fact sensitive determination and courts in other jurisdictions that have not had detailed hourly records on which to base recovery have found other ways to calculate reasonable compensation. *See, e.g. La Mantia v. Durst.*

12. The Pennsylvania Supreme Court has directed this court as to the factors to consider in setting reasonable attorneys' fees in *La Rocca Estate*.

13. Considering all the factors relevant to the determination of attorneys' fees listed in *La Rocca Estate*, and considering the state of readiness of the case for trial at the time of dismissal, and considering the responsibility that defendant Kerns bears for the failure to move the case forward after alienating opposing counsel and the trial judge and for the duplication of work by the plaintiffs' second attorney that became necessary when defendants failed to find a way to advance the underlying suit, and weighing all these factors together, this court finds that the reasonable value of the defendants' services for which they were not compensated is $30,000.00.

An appropriate order follows.

### ORDER

AND NOW, this 30th day of April, 1993, after a bench trial in this case, it is hereby **ORDERED** as follows:

1. On plaintiffs' claim for damages as a result of defendants' alleged breach of the second fee agreement whereby defendants collected a 25 percent contingency fee on plaintiffs' settlement with Western Casualty and Surety Company, judgment is entered in favor of the defendants and against the plaintiffs.

2. On plaintiffs' claim for damages as a result of defendants' alleged breach of the second fee agreement whereby defendants' collected a 27.5 percent contingency fee on plaintiffs' settlement with the Liquor Control Board, judgment is entered in favor of the defendants and against the plaintiffs.

3. On plaintiffs' request for a declaratory judgment that defendants are not entitled to any additional fees from settlement proceeds achieved in the underlying case after defendants' dismissal, judgment is entered in favor of the defendants and against the plaintiffs; and

4. On defendants' counterclaim for recovery of attorneys' fees based on quantum meruit for work performed in the underlying

case before their dismissal, judgment is entered in favor of the defendants and against the plaintiffs in the amount of $30,000.00.

### MEMORANDUM AND ORDER

Plaintiffs have filed this motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e) and 52(b). Plaintiffs object to this court's order giving defendants a quantum meruit recovery of $30,000 for uncompensated legal services they rendered to plaintiffs in the underlying case before they were discharged. Their objections rest on two grounds: first, they claim that the court misinterpreted the law; and, second, they claim that the amount of the award was against public policy because, when combined with the fees their replacement attorney charged, it resulted in too high a percentage of plaintiffs' recovery going to legal fees. For reasons that appear below, the court will deny the motion.

Plaintiffs conclude that the court relied primarily on New York law and that it was mistaken in its reading of that law. Plaintiffs are wrong in both conclusions because they fail to understand the purpose of the court's discussion of New York law. In interpreting the Pennsylvania law of recovery of fees after dismissal of an attorney who had a contingent fee agreement, plaintiffs relied on two cases from the Pennsylvania Superior Court. One of them, *Lampl v. Latkanich,* 210 Pa.Super. 83, 231 A.2d 890 (1967), in dictum that plaintiffs claimed made their point, relied on a New York case, *In re Woodworth,* 15 F.Supp. 291 (S.D.N.Y.), *aff'd,* 85 F.2d 50 (2d Cir.1936). This court explored that New York case to determine whether it supported plaintiffs' interpretation of the dictum in *Lampl* and concluded that it did not. Plaintiffs are mistaken in thinking that the court relied primarily on New York law and their extended discussion in their memo of New York law as it evolved subsequent to the *Lampl* decision is therefore irrelevant.

■ Plaintiffs' second ground for their motion is that the court's decision is against public policy because plaintiffs will end up having to pay almost 40% of their total recovery in the underlying case in attorneys' fees, once they add the amount that this court found they owe defendants to the 30% their replacement attorney charged them for completing the case and the amount that they had paid defendants before dismissing them.

The court calculated the amount that was due to the defendants based on the theory of quantum meruit, using the factors set out by the Pennsylvania Supreme Court in *In re Trust Estate of La Rocca,* 431 Pa. 542, 246 A.2d 337 (1968) and concluded that they deserved $30,000. The plaintiffs contend that what defendants deserve must be limited by what plaintiffs should have to pay in total legal fees in the underlying case, and if the amount that plaintiffs' replacement (and current) attorney charged was reasonable, then the court's award to defendants is not reasonable because it results in total legal fees that are too high. Plaintiffs argue that public policy requires that the court limit defendants' compensation so that plaintiffs do not have to spend more than 30% of the total recovery on attorneys' fees. Plaintiffs have cited no authority for the novel idea that the defendants' quantum meruit award may be limited by what defendants' replacement attorney charged or that the total fee is subject to a specified limitation. Their suggestions in this regard are untenable.

Initially, as the court noted in its findings of fact and conclusions of law, the plaintiffs themselves were not totally without fault so that if there were some equitable limitation on the total amount of the fee, there is no reason for the defendants to bear the entire burden of that limit.

Secondly, accepting plaintiffs' position would mean that what defendants could recover would depend on whatever a replacement attorney decided to charge, so long as the latter's fee was at all reasonable. The court would then be required to determine the reasonableness of the replacement attorney's fee. If the court had undertaken in this case to determine what was a reasonable fee for the replacement attorney to have charged, the court might well have determined that, as of the date of hiring, given the state of the preparation of the case, the remaining defendants, and the unknown factors in any contingency fee case, a fee of less than 30% would have been reasonable. Thus, in order to meet plaintiffs' purported

overall fee limitation, their replacement attorney's fee could be reduced rather than defendants' fee.

The court did not engage in any such exercise but instead focused on the reasonable value of the services rendered by the defendants. The negotiations and agreements between plaintiffs and their replacement attorney were a matter between them and were irrelevant to this inquiry.

The court has already reduced defendants' recovery in consideration of Kerns' role in delaying resolution of some of plaintiffs' claims. The plaintiffs have proposed no new and valid grounds for a further reduction. What defendants deserve is independent of what a later attorney charged, and their recovery cannot fairly be adjusted to accommodate his fee.

An appropriate order follows.

### ORDER

AND NOW, this 10th day of June, 1993, upon consideration of plaintiffs' motion to amend or alter judgment, and the briefs thereto, it is hereby ORDERED that plaintiffs' motion is DENIED.